The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 13, 2025

## 2025COA88

**No. 24CA1046 *Castillo v. STEM* — Government — Colorado Governmental Immunity Act — Claire Davis School Safety Act; Justiciability — Mootness**

As a matter of first impression, a division of the court of appeals considers whether the Claire Davis School Safety Act, § 24-10-106.3, C.R.S. 2025, requires a case to proceed to a jury trial after the parties have completed full discovery, the defendant deposits with the court the maximum amount of damages that the plaintiffs could recover at trial, and the defendant agrees that the sum may be released to the plaintiffs but does not admit liability. The division concludes that in these circumstances, a district court does not err by dismissing the case as moot.

Court of Appeals No. 24CA1046
Douglas County District Court No. 21CV30323
Honorable Gary M. Kramer, Judge

John Castillo and Maria Castillo,

Plaintiffs-Appellants,

v.

STEM School Highlands Ranch, Science Technology Engineering and Math (STEM) School, and Science Technology Engineering and Math (STEM) High School,

Defendants-Appellees.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE SCHUTZ
Grove and Bernard*, JJ., concur

Announced November 13, 2025

The Dan Caplis Law Firm, LLC, Daniel J. Caplis, Babar Waheed, Denver, Colorado; 5280 Appellate Group, Nelson Boyle, Denver, Colorado for Plaintiffs-Appellants

Hall & Evans, L.L.C., Ryan L. Winter, Andrew P. Reitman, Matthew J. Hegarty, Denver, Colorado, for Defendants-Appellees

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1 Plaintiffs, John and Maria Castillo (the Castillos), appeal the district court's judgment dismissing as moot their claims against defendant, STEM School Highlands Ranch aka the Science Technology Engineering and Math High School (STEM).[1] We affirm.

## I. Background and Procedural History

### A. School Violence

¶ 2 School shootings in the United States occur with alarming repetition, terrorizing students, teachers, families, and communities. Colorado has not escaped these tragedies. *See* Ch. 266, sec. 1(2), 2015 Colo. Sess. Laws 1035 (Between 1999 and 2015, there were "three separate incidents of school violence [in Colorado] in which students [were] killed at their schools."); Haylee May, *Colorado Already Has Measures in Place to Prevent School Shootings, Where Are the Gaps?*, Colo. Pub. Radio (Sept. 12, 2025), https://perma.cc/Z4HX-NN66 ("Colorado has seen [twenty-five] incidents of gunfire on school campuses since 2013 . . . .").

---

[1] The Castillos also named the Douglas County School District as a defendant. However, the District and the Castillos settled their dispute, and the District is not a party to this appeal.

¶ 3    In an effort to prevent school violence and to compensate victims, while simultaneously protecting public and charter schools from unlimited liability, the Colorado General Assembly passed the Claire Davis School Safety Act (Act), § 24-10-106.3, C.R.S. 2025. The General Assembly explained the Act's multiple objectives as follows:

> (3) . . . [T]he General Assembly . . . declares the purposes of this [A]ct are:
>
> (a) To recognize and state that there is a limited duty of reasonable care upon public schools, charter schools, and their employees to provide for student safety and to protect students and employees in their schools;
>
> (b) To waive on a limited basis governmental immunity, thereby allowing for recovery of capped damages where that duty of reasonable care has been breached by a school district, charter school, or their employees; and
>
> (c) To waive on a limited basis governmental immunity to ensure that there is a robust and effective discovery through the legal system of the causes of acts of school violence.
>
> (4) It is the intent of the [G]eneral [A]ssembly in enacting this [A]ct to affirmatively recognize a statutory duty upon school districts, charter schools, and their employees to protect students, faculty, and staff from foreseeable harm caused by other persons. The [G]eneral [A]ssembly hereby declares that the purpose of recognizing that this duty exists under this

2

[A]ct is to create a tort remedy against school districts and charter schools in cases where a school district, charter school, or its employees knew or should have known of the danger that was presented and breached that duty of care.

(5) The [G]eneral [A]ssembly also further states that its intent in enacting the provisions in this [A]ct regarding discovery and settlement is to provide a remedy for plaintiffs affected by acts of school violence and to achieve robust and vigorous discovery of events leading to those incidents of school violence.

2015 Colo. Sess. Laws at 1036; *see Stamp v. Vail Corp.*, 172 P.3d 437, 443 n.7 (Colo. 2007) (treating an uncodified legislative declaration of purpose "as equal in authority" to a codified declaration).

¶ 4 To achieve these objectives, the General Assembly created a limited waiver of schools' sovereign immunity to permit victims of school violence to bring a claim for monetary damages, subject to the limits of the Colorado Governmental Immunity Act (CGIA), *see* §§ 24-10-101 to -120, C.R.S. 2025, and to engage in "vigorous discovery" concerning the events leading to the school violence. 2015 Colo. Sess. Laws at 1036.

¶ 5 This case requires us to resolve whether, after the completion of vigorous and full discovery, a defendant's deposit of a plaintiff's

3

maximum potential recovery in the court's registry — with an agreement that such funds should be delivered to the plaintiffs in satisfaction of their claim, but without an admission of liability — permits the court to dismiss a plaintiff's claims as moot. We conclude that it does and therefore affirm the district court's dismissal of the Castillos' claims against STEM.

## B.    The 2019 Shooting

¶ 6    STEM is a publicly funded charter school. On May 7, 2019, two STEM students obtained handguns, entered a classroom that contained twenty-nine students — including eighteen-year-old Kendrick Castillo[2] — blocked the door, and started shooting. One of the perpetrators fatally shot Kendrick when Kendrick rushed forward to protect others in the classroom. Students then restrained both perpetrators until police officers arrived.[3] Kendrick's selfless and heroic actions are credited with saving many lives. He was murdered two weeks before his high school graduation.

---

[2] To avoid confusion with his parents, we refer to Kendrick by his first name. We mean no disrespect in doing so.
[3] Both perpetrators were subsequently convicted of first degree murder.

## C. District Court Proceedings

¶ 7 In May 2021, the Castillos brought a wrongful death action under the Act against STEM, seeking monetary damages attributed to their son's death. The Castillos alleged that STEM should have reasonably foreseen the shooting because the perpetrators insinuated on social media and in an internet post that they planned to carry out a violent act at the school. The Castillos argued that Kendrick's death resulted from STEM's alleged failure to take protective steps in view of these threats. They requested a jury trial to determine the amount of their damages. The Castillos did not request any form of injunctive or declaratory relief.[4]

¶ 8 Early in the case, STEM moved under C.R.C.P. 67(a) to deposit $387,000 — the maximum recoverable amount under the CGIA[5] — in the court's registry and to have the court dismiss the action as moot. STEM did not concede liability, arguing that the Castillos'

---

[4] With respect to incidents of violence that occurred before July 1, 2017, the Act originally prohibited a court from entering a declaratory judgment that a public school or charter school had acted negligently. Ch. 266, sec. 2, § 24-10-106.3(9)(b)(I)-(II), 2015 Colo. Sess. Laws 1036-1038. But this provision was repealed effective July 1, 2018. *Id.*

[5] The parties agree that this sum represented the maximum amount the Castillos could recover from STEM under the CGIA.

claims were subject to the CGIA and that, by tendering the maximum recoverable amount under the CGIA, their claims were rendered moot.

¶ 9 The district court denied STEM's motions after finding that, although the CGIA permitted STEM to deposit the maximum recoverable damages into the court's registry, dismissal at that point was inappropriate because section 24-10-106.3(10) prohibits a party from using procedural mechanisms, such as an offer of settlement, default, or confession of judgment, to unilaterally resolve a case before the completion of full discovery.

¶ 10 The parties made their initial disclosures in November 2021. STEM moved for a broad protective order, which the district court granted over the Castillos' objection. Between November 2021 and December 2022, the parties engaged in robust discovery: 21 depositions — including those of designees of the Douglas County School District and STEM — the disclosure of over 25,000 pages of records, a site inspection, and the review of extensive law enforcement investigation records and testimony provided through the perpetrators' criminal proceedings. After the completion of discovery, the district court set a February 2023 jury trial.

¶ 11    In December 2022, STEM renewed its C.R.C.P. 67 motion and its motion to dismiss, arguing that the case was now moot because the parties had completed discovery and STEM had deposited the full amount of the Castillos' potential monetary damages with the court. STEM thereafter moved to convert the jury trial into a bench trial to address the jurisdictional issue of whether STEM was immune from the Castillos' claims. *See Trinity Broad. of Denv., Inc. v. City of Westminster*, 848 P.2d 916, 925-27 (Colo. 1993).

¶ 12    In February 2023, the district court granted STEM's renewed C.R.C.P. 67 motion and its motion to dismiss after making the following findings:

(1)    STEM's broad immunity under the CGIA had been partially waived under the Act.

(2)    Pursuant to *Rudnick v. Ferguson*, 179 P.3d 26 (Colo. App. 2007), a claim under the CGIA may become moot if the defendant deposits with the court the maximum amount recoverable by the plaintiffs at trial. *Id.* at 29.

(3)    Neither the CGIA nor C.R.C.P. 67 required STEM to admit liability or confess judgment if it tendered the

maximum recoverable amount and no other relief was requested.

(4) Because the parties agreed that the Castillos' maximum recovery was $387,000, STEM had deposited that sum into the court registry, and full discovery had been completed pursuant to the Act, dismissal was appropriate.

¶ 13 The court entered the order granting STEM's motions to dismiss subject to the following conditions:

> 1) STEM is to deposit certified funds in the amount of $387,000 into the registry of the Douglas County District Court;
>
> 2) The Clerk of Court is to pay over those funds to . . . [the Castillos' counsel];
>
> 3) By the deposit of the funds, STEM is not deemed to have admitted liability or confessed judgment.
>
> 4) Upon deposit of the funds, the Plaintiffs['] claims will become moot and the trial will be vacated.
>
> 5) The case will be dismissed once the protective order issue regarding the claims of confidential information has been resolved.

¶ 14 The district court appointed a special master to resolve the issues related to the "designation of confidential information

8

pursuant to the protective order." In October 2023, the special master issued his final order, "Special Master Order No. 3" (SMO3), concluding that portions of deposition testimony would remain confidential because they were protected by the deliberative process privilege. *See City of Colorado Springs v. White*, 967 P.2d 1042, 1050 (Colo. 1998) (concluding that the deliberative process privilege is part of the common law of Colorado).

¶ 15    The Castillos asked the district court to modify portions of SMO3 to permit the public release of certain documents that the special master had concluded were protected from disclosure. In April 2024, the court held a closed hearing to address the contested materials. After the hearing, the court largely adopted SMO3 but made portions of two additional deposition transcripts publicly available. The April order resolved all outstanding discovery issues, and neither party challenges any of the special master's or the district court's discovery orders on appeal.

¶ 16    The Castillos filed a motion asking the court to reconsider its February 2023 dismissal order in light of *Scardina v. Masterpiece Cakeshop, Inc.*, 2023 COA 8, ¶ 42, *vacated on other grounds*, 2024 CO 67. STEM opposed the Castillos' motion and moved for the

entry of final judgment. The court set the matter for a hearing and ordered the parties to file motions addressing how the case should proceed. After full briefing, the court dismissed the case and reaffirmed its February 2023 order.

¶ 17    The district court distinguished the division's decision in *Scardina*,[6] which was brought under the Colorado Anti-Discrimination Act (CADA), because the statutory relief under CADA serves to vindicate a plaintiff's constitutional right to be free from discrimination and permits only a nominal fine rather than economic damages.[7] In contrast, the court reasoned that the Act's purposes include ensuring the completion of full discovery and providing meaningful economic compensation for victims of school violence. Given these disparate purposes, the district court concluded that *Scardina* did not control.

---

[6] The district court's order was issued before the supreme court decided *Masterpiece Cakeshop, Inc. v. Scardina*, 2024 CO 67, which vacated the district court's and the division's orders and dismissed the case. *Id.* at ¶ 61. In doing so, the court expressed "no opinion about the merits of Scardina's claims, and nothing about today's holding alters the protections afforded by CADA." *Id.*

[7] In 2025, the General Assembly amended CADA to allow a person aggrieved by a CADA violation to recover limited economic damages. *See* Ch. 232, sec. 3 § 24-34-602(1)(a), 2025 Colo. Sess. Laws 1099.

¶ 18    The district court concluded that dismissal was appropriate because (1) the parties had completed full and vigorous discovery; (2) the Castillos sought only economic damages, and STEM tendered the maximum amount of recoverable damages; (3) there was no further relief that the court could grant beyond the $387,000 that STEM had deposited into the court's registry; (4) the Act contemplates settlement and does not mandate that a trial occur; and (5) the Act does not require a determination or assessment of liability.

¶ 19    The district court also noted that, because the parties had completed discovery, the Act's prevention and accountability purposes had been served because "the public information disclosed in discovery will be scrutinized and debated by school officials, safety officials, parents, teachers," and concerned members of the public, and that the court of public opinion will determine whether STEM breached its duty of reasonable care. This appeal followed.

## II.    Analysis

¶ 20    The Castillos contend that the district court erred by granting STEM's motion to dismiss and depriving them of the opportunity to

have a jury determine STEM's liability. They argue that the Act's legislative intent suggests that a plaintiff may compel a trial to facilitate public disclosure of the events leading to the act of school violence, determine the standard of care, and hold a negligent school publicly accountable. The Castillos also argue that STEM used improper procedural mechanisms to render their claims moot, and in any event, the claims are not moot under multiple exceptions to the mootness doctrine.

¶ 21    We begin our analysis by setting forth the controlling legal standards and then address the Castillos' specific legal arguments.

### A.    Standard of Review and Statutory Construction

¶ 22    Statutory interpretation presents a question of law that we review de novo. *Colo. State Bd. of Educ. v. Brannberg*, 2023 CO 11, ¶ 15. When interpreting statutes, we seek to discern and give effect to the General Assembly's intent. *Id.* "In doing so, we apply words and phrases in accordance with their plain and ordinary meanings, and we consider the entire statutory scheme to give consistent, harmonious, and sensible effect to all of its parts." *Id.* If the statute's language is clear, "we must apply it as written, and we need not resort to other rules of statutory construction." *Id.* at

¶ 16.  Additionally, when construing a statute, we must respect the legislature's choice of language.  *UMB Bank, N.A. v. Landmark Towers Ass'n*, 2017 CO 107, ¶ 22.  Therefore, we do not add words to or subtract words from the statute.  *Id.*

¶ 23     If a statute's meaning is clear based on its plain language, we generally do not consult the statute's legislative history.  *Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1190 (Colo. 2010).  Moreover, a court may not interpret a statute to accomplish something that the statute's plain language does not suggest, warrant, or mandate.  *Shelter Mut. Ins. Co. v. Mid-Century Ins. Co.*, 246 P.3d 651, 661 (Colo. 2011).

¶ 24     We review a district court's grant of leave to deposit funds under C.R.C.P. 67(a) for an abuse of discretion.  *Coors Brewing Co. v. City of Golden*, 2013 COA 92, ¶ 75.  A district court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misconstrues or misapplies the law.  *Moore v. 4th Jud. Dist. Att'y*, 2024 COA 48, ¶ 6.

¶ 25     Whether a case is moot also presents a question of law that we review de novo.  *Colo. Mining Ass'n v. Urbina*, 2013 COA 155, ¶ 23.  Courts exercise their jurisdiction to address actual controversies

between parties. *Rudnick*, 179 P.3d at 29. A case becomes moot when the relief sought, if granted, would have no practical legal effect on the controversy. *Urbina*, ¶ 22. Subject to limited exceptions, a court will not exercise its jurisdiction if the case has become moot. *Id.*

### B.    Applicable Laws

#### 1.    The CGIA and the Act

¶ 26    Generally, the CGIA provides public entities — including public schools and charter schools — broad immunity, but it waives immunity for injuries arising out of certain designated actions. § 24-10-106(1), C.R.S. 2025 ("A public entity is immune from liability in all claims for injury that lie in tort or could lie in tort" unless such immunity has been expressly waived.); § 24-10-106(1)(a)-(k) (waiving sovereign immunity for injuries arising from specifically delineated governmental actions).

¶ 27    The CGIA includes monetary caps limiting how much a plaintiff can recover from a public entity. *See* § 24-10-114(1)(a)-(b), C.R.S. 2025. Claims brought under the Act are subject to the statutory caps. § 24-10-106.3(9)(a). As previously noted, the parties agree that the maximum amount that the Castillos could

14

recover under the Act was $387,000.[8]  *See* § 24-10-114(1)(a)-(b); *see also* Colorado Secretary of State, Certificate (Jan. 5, 2022), https://perma.cc/4FAP-YS2X.

¶ 28 Under the Act, a plaintiff may recover monetary damages if the school breached its "duty to exercise reasonable care to protect all students, faculty, and staff from harm from acts committed by another person when the harm is reasonably foreseeable, while such students, faculty, and staff are within the school facilities or are participating in school-sponsored activities." § 24-10-106.3(3). A publicly funded charter school's sovereign immunity is waived under the CGIA "with respect to . . . a claim of a breach of the duty of care established in [the Act] . . . arising from an incident of school violence." § 24-10-106.3(4).

---

[8] The CGIA imposes a statutory maximum that individuals can recover "[f]or any injury to one person in any single occurrence." § 24-10-114(1)(a)(I), C.R.S. 2025.  The maximum recovery is periodically adjusted "by an amount reflecting the percentage change over a four-year period in the United States department of labor, bureau of labor statistics, consumer price index for Denver-Aurora-Lakewood for all items and all urban consumers, or its applicable predecessor or successor index." § 24-10-114(1)(b).

¶ 29    In service to its discovery, disclosure, and prevention purposes, the Act provides as follows:

> In order to promote vigorous discovery of events leading to an incident of school violence in any action brought under this section, an offer of judgment by a defendant under section 13-17-202, C.R.S. [2025], prior to the completion of discovery, is not deemed rejected if not accepted until fourteen days after the completion of discovery, and the plaintiff is not liable for costs due to not accepting such an offer of judgment until fourteen days after the completion of discovery.  If a defendant refuses to answer a complaint, or a default judgment is entered against a defendant for failure to answer a complaint, or a defendant confesses liability in an action brought under this section, the court shall allow full discovery upon request of the plaintiff.

§ 24-10-106.3(10).

2.    *Rudnick*, C.R.C.P. 67, and *Scardina*

¶ 30    Both the CGIA and the Act attempt to facilitate multiple purposes.  On the issue of economic damages, the General Assembly has attempted to provide a measure of compensation to plaintiffs, or their next of kin, for injuries caused by specific governmental conduct, while at the same time avoiding excessive economic exposure to governmental entities.

¶ 31     Consistent with these dual purposes, our case law recognizes that a governmental defendant may invoke C.R.C.P. 67(a) to render a case moot, even when an injured plaintiff would prefer to proceed to trial.  *See Rudnick,* 179 P.3d at 30-32; C.R.C.P. 67(a) (A defending party may "deposit with the court all or any part of such sum or thing, to be held by the clerk of the court subject to withdrawal in whole or in part at any time thereafter upon order of the court.").  Even if the deposit does not include an admission of liability or confession of judgment, the district court may deem the claim moot if the defending party deposits the maximum recoverable amount under the CGIA and agrees that the sum may be delivered to the plaintiff in satisfaction of their claims.  *Rudnick,* 179 P.3d at 30.

¶ 32 In *Scardina*,[9] a division of this court addressed *Rudnick*'s application to CADA. *Scardina*, ¶¶ 38-50; *see also* §§ 24-34-600.3 to -605, C.R.S. 2025. The division concluded that CADA was enacted by the General Assembly to "fulfill the 'basic responsibility of government to redress discriminatory . . . practices.'" *Scardina*, ¶ 44 (quoting *Elder v. Williams*, 2020 CO 88, ¶ 24). Therefore, in the context of an aggrieved party seeking injunctive relief under CADA, the division concluded that the trial court correctly found that the case was not moot under *Rudnick* because the core policy of CADA would be frustrated if a defendant could "avoid the finding of discrimination simply by paying a fine." *Scardina*, ¶ 46.

---

[9] Because the Colorado Supreme Court vacated the division's opinion, it no longer has the precedential value it did when the district court dismissed this case. *See City of Arvada ex rel. Arvada Police Dep't v. Denv. Health & Hosp. Auth.*, 2017 CO 97, ¶ 24 n.3. Nonetheless, we understand that the Castillos contend that we should apply the same legal rationale articulated in *Scardina* to reverse the district court's dismissal order. Thus, we address whether *Scardina*'s legal reasoning applies to claims brought pursuant to the Act. *Id.* ("[B]ecause our vacated opinion no longer holds precedential value, we have revisited this issue and reach the same conclusion.").

18

C.     Legislative Intent Argument

¶ 33     The Castillos argue that we should interpret the Act in light of its legislative intent.  Specifically, they acknowledge that the Act's "purposes are unambiguous," but they argue that "the Act is ambiguous as to how it will accomplish these purposes — especially so, if it allows partially suppressed discovery without any means to fulfill the [General Assembly's] intention to make schools safer." From their perspective, the purposes of providing reasonable compensation and limiting governmental financial exposure should not be elevated to the height that they shade the full public disclosure and accountability provided by a jury trial and verdict on the parties' substantive contentions.

¶ 34     The Castillos' argument has some initial appeal, but it fails on closer examination.  True, a jury trial involving matters of public interest often serves to educate the public and incentivize policy changes.  And one aspect of a trial is cross-examination, which is often cited as the legal system's greatest truth-finding mechanism. *See California v. Green,* 399 U.S. 149, 158 (1970) (describing cross-examination as the "greatest legal engine ever invented for the discovery of truth" (quoting 5 John Wigmore, *Evidence* § 1367 (3d

ed. 1940))). On the other hand, there is an equally compelling interest in allowing governmental defendants to avoid unnecessary litigation in order to conserve public resources. *Finnie v. Jefferson Cnty. Sch. Dist. R-1*, 79 P.3d 1253, 1260-61 (Colo. 2003). Ultimately, these types of policy choices are best left to the General Assembly.

¶ 35     This deference to the General Assembly is particularly apt — indeed, required absent a constitutional violation — when the General Assembly has chosen between options available to it. *Anderson v. Longmont Toyota, Inc.*, 102 P.3d 323, 326-27 (Colo. 2004) ("Our duty is to effectuate the intent and purpose of the General Assembly. We apply the plain and ordinary meaning of the statute, if clear." (citation omitted)). Nowhere in the Act did the General Assembly direct that a trial must be held if a plaintiff demands it. In contrast, the Act specifically contemplates the completion of "vigorous" and "full discovery." § 24-10-106.3(10).

¶ 36    The word "discovery" has specific legal meaning,

> 1. The act or process of finding or learning something that was previously unknown . . . .
> 2. Compulsory disclosure, at a party's request, of information that relates to the litigation . . . . The primary discovery devices are interrogatories, depositions, requests for admissions, and requests for production . . . .
> 3. The facts or documents disclosed . . . .
> 4. The pretrial phase of a lawsuit during which depositions, interrogatories, and other forms of discovery are conducted.

Black's Law Dictionary 584-85 (12th ed. 2024).

¶ 37    When the General Assembly used the term "discovery" in section 24-10-106.3, it did so while referring to remedies that are generally available to a defendant to settle a case prior to trial. *See* § 13-17-202, C.R.S. 2025. Thus, the General Assembly used "discovery" in a legal sense. That legal context refers to "[t]he pretrial phase of a lawsuit" rather than the trial itself. Black's Law Dictionary at 584. This provision reflects the General Assembly's intent to permit vigorous and full discovery but does not demonstrate an intent to force a school to trial when the plaintiff only sought monetary relief and the school has deposited with the court the full measure of money damages requested in the complaint.

21

¶ 38    Section 24-10-106.3's language permitting full and vigorous discovery before settlement, without reference to any right to compel a public trial, reflects the General Assembly's conscious choice to require discovery but also to permit a post-discovery resolution in the manner contemplated by *Rudnick*.  Contrary to the Castillos' argument, this legislative action does not create an ambiguity in how the purposes of the Act will be fulfilled but rather reflects the General Assembly's deliberate choice.[10]  We are bound to respect that legislative choice rather than ignore the Act's plain language to achieve a different result.  *UMB*, ¶ 22.

¶ 39    In addition to being inconsistent with the legislative mandate, the Castillos' argument is premised on an erroneous legal assumption.  Particularly, they argue that a trial is necessary because "juries decide the standards of care."  We disagree.

¶ 40    First, the Act expressly sets forth STEM's standard of care in these situations.  § 24-10-106.3(3).  Second, to the extent that the

---

[10] We also note that a trial is not the only venue in which the discovery mandated by the statute could be useful in fulfilling the Act's purposes of education, prevention, and accountability.  A party may present the information obtained in discovery to a school board, the legislature, a city council, the media, and the governor's office, among others.

language of the Act permits any uncertainty concerning the applicable standard of care, the resolution of that issue is entrusted to courts, not to juries. *See White v. Pines Enters., Inc.*, 728 P.2d 759, 760 (Colo. App. 1986) ("Whether there is a duty of care to plaintiff is not a matter to be submitted to or decided by a jury. It is a question of law for decision by the trial court." (citation omitted)).

¶ 41 Finally, though we may not consider legislative history to create an ambiguity, we may rely upon the General Assembly's statement of purpose — whether codified or not — in confirming that our interpretation of a statute is consistent with that purpose. *Stamp*, 172 P.3d at 443 n.7; *Welby Gardens v. Adams Cnty. Bd. of Equalization*, 71 P.3d 992, 995-98 (Colo. 2003) (considering legislative history to support the court's plain language interpretation of an unambiguous statute). And here, the district court interpreted and applied the Act consistently with its stated purpose.

¶ 42 Accordingly, we conclude that the district court's interpretation and application of the Act were not contrary to the General Assembly's intent when adopting it.

D.   The Reasoning of *Scardina* Is Not Inconsistent with *Rudnick*

¶ 43   The Castillos argue that the district court erred by not reconsidering its decision that the case was moot under *Rudnick* in view of the reasoning applied in *Scardina.*  We disagree.

¶ 44   *Rudnick* arose under the CGIA, while *Scardina* arose under CADA.  *See Scardina,* ¶ 43.  This distinction is vital to understand the scope of the respective decisions.  The CGIA primarily focuses on providing economic compensation for victims who are injured through governmental action for which immunity has been waived.  *Id.*  On the other hand, at the time of the division's decision in *Scardina,* CADA imposed "a fine to deter discriminatory practices by the defendant rather than to award damages to fully compensate the aggrieved party."  *Id.*  Thus, CADA's primary focus was not on providing economic compensation to a plaintiff but, rather, "to fulfill the 'basic responsibility of government to redress discriminatory . . . practices.'"  *Id.* at ¶ 44 (citation omitted).

¶ 45   One trait that CADA and the CGIA do share is that neither contains an express provision addressing whether a case may be settled under C.R.C.P. 67(a) before trial.  In *Rudnick,* given the economic remedy provided by the CGIA, the division concluded that

24

a defendant could invoke C.R.C.P. 67 to render a claim moot by depositing with the court the full amount the plaintiff could recover under the CGIA. *Rudnick*, 179 P.3d at 30-31. The division reasoned that defendants could use this process even though they did not agree to confess judgment or otherwise admit liability.

¶ 46 In contrast, given CADA's broader public policy and limited compensatory purposes, the division in *Scardina* concluded that the district court did not err by declining to permit the defendant to use the C.R.C.P. 67 process to moot the case. *Scardina*, ¶¶ 38-50. Indeed, the division concluded that to do so would undermine CADA's purpose, diminish the precedential value of a liability finding, and undermine the "broad societal interests in affirming the equality of all persons and disavowing discriminatory practices in the public sector." *Id.* at ¶ 46.

¶ 47 The Castillos urge us to adopt the division's reasoning in *Scardina* to disavow the use of C.R.C.P. 67 under the Act. We decline to do so for two reasons. First, we perceive material differences between the absence of an economic remedy provided by CADA at the time of the *Scardina* opinion and the significant economic remedy provided by the Act.

¶ 48     Second, and most critically, in the Act — unlike in CADA — the General Assembly expressly addressed limitations on a defendant's use of procedural mechanisms to obtain dismissal of a case.  The Act limits such practices prior to the completion of vigorous and full discovery.  By drawing this line, the General Assembly implicitly determined that such practices are permitted after the completion of discovery, without requiring a trial.  *See Kinslow v. Mohammadi*, 2024 CO 19, ¶ 21 ("This interpretation of legislative silence is consistent with 'the General Assembly's policy choice' . . . ." (quoting *Elgin v. Bartlett*, 994 P.2d 411, 415 (Colo. 1999))).  As previously explained, we must interpret the Act in a manner that effectuates the General Assembly's intent.  Thus, we conclude that the reasoning in *Scardina* does not apply here.

¶ 49     The Castillos next argue that *Rudnick*'s reasoning has been rendered untenable by the United States Supreme Court's decision in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016).  *Campbell-Ewald* held that an "unaccepted settlement offer has no force," and "[w]ith the offer off the table, and the defendant's continuing denial of liability, adversity between the parties persists."  *Id.* at 156.  But *Campbell-Ewald* is distinguishable on multiple grounds.

¶ 50    First, that case is based on Federal Rule of Civil Procedure 68, not C.R.C.P. 67.  *Id.*  Second, even if it were interpreting a parallel rule, we are not bound by the Court's interpretation of federal rules when interpreting a Colorado Rule of Civil Procedure.  *See Garcia v. Schneider Energy Servs., Inc.*, 2012 CO 62, ¶ 10 ("While this [c]ourt is not bound to interpret our rules of civil procedure the same way the United States Supreme Court has interpreted its rules, we do look to the federal rules and federal decisions interpreting those rules for guidance.").

¶ 51    Most importantly, in *Campbell-Ewald*, the Supreme Court expressly stated that it was not deciding "whether the result would be different if a defendant deposits the full amount of the plaintiff's individual claim in an account payable to the plaintiff, and the court then enters judgment for the plaintiff in that amount." *Campbell-Ewald*, 577 U.S. at 166.  For these reasons, we disagree with the Castillos' contention that *Campbell-Ewald* renders the holding in *Rudnick* obsolete.

### E.    Mootness Exceptions

¶ 52    The Castillos argue that their claims should proceed to trial even if they are moot because, as they see it, various exceptions to

the mootness doctrine apply to this case. Specifically, they argue that the case should not be deemed moot because (1) the case presents issues of great public importance; (2) collateral consequences are still at issue; and (3) the case is capable of repetition but evades review.

¶ 53    Ordinarily, a case is moot when the relief requested would not have a practical effect upon an existing controversy. *Urbina,* ¶ 22. Nonetheless, as the Castillos argue, various exceptions allow a case to proceed that would otherwise be moot. But contrary to their arguments, we conclude that none of the cited exceptions applies here.

### 1.    Great Public Importance

¶ 54    A dispute that would otherwise be moot may proceed on the merits if the case presents an issue "of great public importance." *People in Interest of C.G.,* 2015 COA 106, ¶ 37. We agree with the Castillos that there is significant public interest in preventing and remediating incidents of school violence. As previously explained, we also agree that the litigation process, including discovery and jury trials, can offer a means to educate parties and the public about the risks that schools face and the type of remedial measures

28

that schools have available to mitigate or prevent such tragedies. But it is clear that the General Assembly was also aware and mindful of these considerations when it passed the Act. And with that knowledge, the General Assembly adopted section 24-10-106.3(10), which limits a defendant's use of procedural mechanisms to obtain a dismissal of the case against a plaintiff's wishes.

¶ 55 The line drawn by the General Assembly reflects a decision to facilitate the completion of discovery but not to compel a trial once that discovery is completed and a defendant has complied with the *Rudnick* procedures. We are not at liberty to disregard this line simply because the issues to be addressed at a potential trial present a matter of public interest. *See Principal Mut. Life Ins. Co. v. Progressive Mountain Ins. Co.*, 1 P.3d 250, 256 (Colo. App. 1999) ("[I]t is for the General Assembly to balance competing social goals. . . . [W]e cannot supply a right or remedy the General Assembly has chosen not to provide."), *aff'd*, 27 P.3d 343 (Colo. 2001).

2. The Collateral Consequences Exception

¶ 56 Next, the Castillos invoke the "collateral consequences" exception to mootness. This exception is often invoked in the

29

criminal context to allow a defendant to appeal a criminal conviction that has ongoing collateral consequences even though the defendant has already completed the underlying sentence. *See DePriest v. People,* 2021 CO 40, ¶ 10 ("Even if a sentence has been fully served, an appeal of the underlying conviction is not moot if there is a possibility that the conviction will give rise to collateral consequences."). Often the defendant's completion of their sentence prevents a court from granting any effective relief. But application of general mootness principles in this context may be unjust if the defendant may still be adversely affected by the conviction. *See id.* at ¶ 9 ("Collateral consequences can include prohibitions on a felon's ability to vote and own firearms, potential sentencing as a habitual criminal, possible impeachment based on prior convictions, and proscription from working in certain regulated professions.").

¶ 57 Recognizing this practical reality, courts have created the collateral consequences doctrine as an exception to general mootness principles to ensure that a claiming party is not deprived of the opportunity to avoid these adverse collateral impacts. *Id.* ("Under the collateral consequences exception to the mootness

doctrine, a case is moot 'only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.'" (quoting *Sibron v. New York*, 392 U.S. 40, 57 (1968))).

¶ 58    Drawing from these principles, the Castillos argue that their claims are not moot because a trial could visit additional adverse consequences on STEM.  They cite *C.G.* in support of the argument.  *C.G.* arose when a child was adjudicated dependent or neglected based on father's alleged abandonment of the child and default on the petition.  *Id.* at ¶¶ 3-4.  C.G. was placed with his half-sibling in the custody of the sibling's father, who was later convicted of murdering C.G.  *Id.* at ¶ 5.  Father brought a federal civil rights action against the department of human services, alleging a denial of his due process rights.  *Id.* at ¶ 6.  Father then moved to set aside the adjudication entered against him.  *Id.*

¶ 59    The department argued that father's motion was moot in view of the child's death, but father argued that the adjudication created adverse consequences for him because it impacted his ability to proceed on his federal civil rights claim.  *Id.* at ¶¶ 7-8.  The district court sided with the department and dismissed father's motion.  *Id.*

at ¶ 9. Father appealed to this court, and the division reversed the mootness ruling under the collateral consequences doctrine, noting that the dependency and neglect orders had continuing adverse consequences by limiting father's ability to pursue the federal litigation. *Id.* at ¶¶ 34-35.

¶ 60    The common denominator in *DePriest* and *C.G.* is that the underlying judgment or order being appealed had continuing adverse consequences on the appealing party. The Castillos do not argue that the dismissal of their claims may have continuing adverse consequences for them; rather, they argue that "a jury finding of liability could have had the collateral consequence of harming STEM's reputation by exposing its mistakes (from which the public could learn how to better protect schools)." But the Castillos do not cite any controlling authority, and we are aware of none, that would allow us to invoke the collateral consequences exception to mootness because a trial and resulting judgment could have adverse consequences for an opponent with no tangible consequences to the appealing party. Thus, we see no basis for invoking the collateral consequences exception to mootness.

### 3. Capable of Repetition and Evading Review

¶ 61    Finally, the Castillos argue that the district court erred by not permitting the case to proceed because it presents a controversy that is capable of repetition but evades review. *See Trinidad Sch. Dist. No. 1 v. Lopez*, 963 P.2d 1095, 1102 (Colo. 1998) ("[W]e may resolve what is an otherwise moot case when the issue involved is one that is capable of repetition yet evading review."). But as STEM notes, school shootings — though repeated with disturbing and tragic regularity — are inherently fact specific. And the Castillos do not develop an argument explaining how the "evading review" exception can be appropriately invoked in this case. Accordingly, we decline to address the issue further. *See People v. West*, 2019 COA 131, ¶ 23 (we do not address arguments that are not adequately developed on appeal).

### III.    Summary

¶ 62    In adopting the Act, the General Assembly limited a school's ability to use procedural mechanisms, prior to the completion of vigorous and full discovery, to moot a claim brought to redress injuries resulting from reasonably foreseeable harm caused by an incident of school violence. The Act does not, however, impose such

limitations on a school's ability to utilize the *Rudnick* procedure to moot a case after the completion of such discovery. Thus, the district court did not err by dismissing this dispute as moot after the parties completed discovery, STEM deposited funds in the maximum amount available to the Castillos, and their complaint requested no other relief.

## IV. Disposition

¶ 63 The district court's judgment is affirmed.

JUDGE GROVE and JUDGE BERNARD concur.